Rayfield M. HANDY, Jr., Defendant Below, Appellant,

v.

STATE of Delaware, Plaintiff Below, Appellee.

No. 183, 2001.

Supreme Court of Delaware.

Submitted: June 12, 2002.
Decided: July 24, 2002.

---

Bernard J. O'Donnell, Esquire and Nicole M. Walker, Esquire (argued), Office of the Public Defender, Wilmington, Delaware, for Appellant.

William M. Kelleher, Esquire, Department of Justice, Wilmington, Delaware, for Appellee.

Before VEASEY, Chief Justice, WALSH, HOLLAND, BERGER and STEELE, Justices, constituting the Court en Banc.

VEASEY, Chief Justice.

In this appeal from the Superior Court we consider whether the State may charge a defendant with multiple counts of first degree arson on the basis that the defendant set a single fire intending to harm multiple victims. We hold that a charge of multiple counts of first degree arson for multiple intended victims based on a single fire constitutes an unconstitutional multiplicity prohibited by the Double Jeopardy Clause.

Consonant with the protection against double jeopardy afforded by the United States Constitution, the touchstone for multiplicity is legislative intent. The General Assembly has consistently classified arson as an offense against property, not people. This Court has adopted this distinction in determining whether the State may charge multiple crimes for multiple victims in the absence of another persuasive indicator of legislative intent.

 Because the basis of the crime of arson is directed to the property, the existence of inhabitants is one element in fixing the degree of arson. If the State wishes to prosecute a defendant in connection with an arson in which the defendant intended to harm, or actually did harm, multiple victims in a single fire, only one charge of arson is permissible. Other charges may be appropriate for multiple crimes of harm to persons such as attempted murder (as the State in fact charged Handy with in this case) or murder, depending on the facts. Accordingly, we reverse the judgment of the Superior Court and remand to vacate one of the two sentences for arson first degree and to resentence the defendant on the other charge.

*Facts*

On February 7, 2000, a fire started in the bedroom closet of a mobile home owned by Chevelle D. Goslee. Goslee ran outside and alerted neighbors, one of whom alerted the authorities. Two of her neighbors rescued Rachel M. Houston, Goslee's mother, who was lying injured inside the trailer. The State prosecuted Rayfield M. Handy, Jr., defendant below and appellant, with various charges stemming from this incident, including two counts of arson in the first degree.[1] The only difference between the counts is that one labeled Goslee as the "victim" and the other labeled Houston as the "victim."

At jury selection in the Superior Court, one prospective juror stated that he knew Handy "as a student and a friend of my daughter's." The Superior Court then excused this prospective juror for cause. The dismissed juror walked over to Handy, intending on his way out to shake his hand. Corrections officers and the court bailiff then intervened to keep the excused juror from doing so and ushered him away.

At trial, Goslee testified that she had been romantically involved with Handy in the past, but was not at the time of this incident. Goslee and several friends had a birthday party for Handy at Goslee's mobile home on Friday, February 4. Handy then spent the weekend there. On Monday, Goslee testified, Handy attacked her, choked her, dragged her into her bedroom, and tied her to her bed.

Houston then drove to Goslee's mobile home on an errand and entered the mobile home. Goslee called out to her, Houston

---

1. *See* 11 *Del. C.* § 803 ("A person is guilty of arson in the first degree when the person intentionally damages a building by starting a fire or causing an explosion and when: (1) The person knows that another person not an accomplice is present in the building at the time....").

entered the bedroom, and Houston saw her daughter tied up. Houston testified that she had found her daughter lying bound in her bed and that Handy was there holding a wine bottle. Handy hit Houston over the head several times with an empty wine bottle and knocked her unconscious.

Handy bound Houston's hands and stuffed a cloth in her mouth. Goslee testified that Handy then raped Goslee. He put a book of Goslee's in the bedroom closet, sprinkled cologne over it, and started a fire with a lighter. He stomped the fire out, saying, "I can't do you all like that." He then, however, returned and relit the fire. After taking money from Goslee and her mother, Handy left in Goslee's car.

Handy testified that Goslee invited him over for his birthday on February 4, and that he stayed the weekend. He testified that they had consensual sexual relations. He testified that, on February 7, he discovered that she had herpes, and they exchanged blows, resulting in injury to Goslee's face. He testified that she then tied up one of her arms so that Handy "wouldn't pick her up off the ground." Handy admitted that when Houston came in, he hit her with a glass bottle several times "out of anger towards Chevelle [Goslee]...." He then tied Houston up "[o]ut of panic." He testified that he and Goslee had agreed on a plan to start a fire in her mobile home to collect insurance proceeds. After he had hit Houston, Goslee said, "[W]e can still go on with the plan." He admitted starting a fire, but stated that he stomped the fire out because "it wasn't right to start a fire with [Houston]

there...." He then tied Goslee up so that she would be able to tell the police that someone broke in. He denied resetting the fire.

The jury found Handy guilty of most of the charges against him. Specifically, it found him guilty of both arson counts. Handy has appealed his sentences to this Court.

### Multiple First Degree Arson Counts for Multiple Intended Victims

■ Handy contends that the two charges of arson in this case are multiplicitous and, therefore, violate the Double Jeopardy Clause of the United States Constitution. The State argues that under Delaware law first degree arson is a "person-protecting offense" and, thus, charging multiple counts of arson for multiple intended victims does not violate the multiplicity doctrine.

The scope of review is plain error.[2] Handy concedes that he did not raise this question to the Superior Court. This Court has previously held, however, that a multiplicity violation may constitute plain error.[3]

■ The Double Jeopardy Clause of the United States Constitution states, "[No] ... person [shall] be subject for the same offense to be twice put in jeopardy of life or limb...."[4] One of the protections the Double Jeopardy Clause provides is against multiplicity, the "charging of a single offense in more than one count of an indictment."[5] Prosecutors may not manufacture additional counts of a particular crime by the "simple expedient of dividing a single crime into a ser-

---

2. *Wainwright v. State*, 504 A.2d 1096, 1100 (Del.1986).

3. *Williams v. State*, 796 A.2d 1281, 1284 (Del. 2002).

4. U.S. Const. amend. V.

5. *Feddiman v. State*, 558 A.2d 278, 288 (Del. 1989).

ies of temporal or spatial units." [6] The constitutional prohibition against double jeopardy protects a defendant against being prosecuted for more than one crime if a defendant "commits only one unit of the crime." [7] Indeed, the crime of arson itself raises several distinct multiplicity issues.[8] When determining whether the constitutional protection against double jeopardy permits multiple counts in any particular statutory setting, courts look to the legislative intent.[9] Thus, the question here is whether the General Assembly intended that Handy be charged with only one count of arson because he started only one fire or two counts because he intended harm to two victims.

The Delaware Code permits a charge of second degree arson when a defendant "intentionally damages a building by starting a fire . . . ." [10] Section 803(1) permits a charge of first degree arson upon intentionally damaging a building by fire when the defendant "knows that another person

not an accomplice is present in the building at the time." [11] Section 803(2) relates to intentionally damaging a building by fire when the defendant "knows of circumstances which render the presence of another person not an accomplice therein a reasonable possibility." [12] The State charged Handy under Section 803(1).

The wording of the statute itself does not answer the question at hand. The wording of Section 803(1) seems to *require* the presence of one other person, but to *permit* the presence of more than one, for a single count of arson. The State argues that, to exclude the possibility of multiple arson counts, the legislature could have drafted the statute to refer to the presence of "another person" or "people," or it could have provided that the building needed to have been "occupied." It is equally true, however, that the legislature could have provided one count of arson for each per-

---

6. *Brown v. Ohio*, 432 U.S. 161, 169, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977).

7. *State v. Westling*, 145 Wash.2d 607, 40 P.3d 669, 671 (2002).

8. One, as here, is whether a state may charge a defendant with multiple counts of arson when a defendant sets a single fire with multiple intended victims. *See, e.g., State v. Payne*, 134 Idaho 423, 3 P.3d 1251, 1254 (Id.2000) (holding that multiple counts of arson based upon multiple actual victims was multiplicitous). Another is whether a state may charge a defendant for burning multiple units in a building, *see Passerin v. State*, 419 A.2d 916, 924 (Del.1980) (holding that charging five counts of arson for five separately occupied building units was not multiplicitous), or multiple objects, *see Westling*, 40 P.3d at 671 (holding that a single fire set in one car that also damaged two others was chargeable only by a single arson count), when a defendant sets a single fire. Yet another is whether a state may charge for multiple counts for a single fire when an arson statute has separate provisions for damage to property and damage with intent to defraud an insurer. *See*

*People v. Gard*, 602 N.E.2d 920, 929 (Ill.App. 1992) (holding that two convictions, one for the property owner and one for the insurance company, were not multiplicitous), *overruled on other grounds*, 158 Ill.2d 191, 198 Ill.Dec. 415, 632 N.E.2d 1026.

9. *See Passerin*, 419 A.2d at 924 (holding that "one must look to the substance of the crime to determine whether a single criminal act may support a single or multiple charge" and construing the wording of the relevant statute); *People v. Hanks*, 174 Ill.App.3d 555, 124 Ill.Dec. 153, 528 N.E.2d 1044, 1049 (1988) (Lund, J., dissenting) (looking to the legislative intent); *Westling*, 40 P.3d at 671 ("Thus, when a defendant is convicted of multiple violations of the same statute, the double jeopardy question focuses on what 'unit of prosecution' the Legislature intends as the punishable act under the statute.").

10. 11 *Del. C.* § 802.

11. 11 *Del. C.* § 803(1).

12. 11 *Del. C.* § 803(2).

son present to resolve this question unambiguously in the State's favor.

Although the bare wording of the statute does not answer this question, commentary to the last major revision to the arson statutes tends to indicate that the drafters of the statute did not intend for multiple counts of arson to be available solely on the basis of multiple intended victims. The statutory law against arson has gone through several revisions in Delaware.[13] The original statutory provision concerning arson prohibited "willfully or maliciously burn[ing] or set[ting] on fire of any dwelling house of another."[14] A general revision to the criminal code in 1972 essentially set the crime of first degree arson into its current form, punishing intentional burning when the arsonist knows or reasonably should have known of the presence of another.[15]

In the commentary to that general provision, the drafters stated, "This section imposes class B felony punishment upon arson which is extremely dangerous to human life."[16] They cited an example of a case under Section 803(2): "A intentionally sets fire to an apartment building at night, knowing that it is such a building and that it is not unlikely that *at least some* of the tenants are asleep in their beds;" they characterize A as "guilty of arson in the first degree."[17] The drafters who wrote this commentary based their classification of arson as a class B felony on arson's

---

**13.** The law of arson has a long and venerable history in Delaware law. In 1826, the legislature passed a general codification of the criminal law. Its provision on arson stated, "If any person or persons shall wilfully and maliciously burn or set on fire any dwelling house of another, or any store, barn, stable or other building adjoining to or parcel of a dwelling house of another, or the Court House in either of the counties of this State, or any house or office, wherein public records are kept; every person so offending shall be deemed guilty of arson and felony, and, upon conviction thereof, shall suffer death." 1829 *Del. Laws*, c. 5, § 1, at 130 (1829). In 1874, the statutory record of that time showed arson classified as one of the "offences against private property." *See* 20 *Del. C.* § 128 (1874) ("If any person shall willfully and maliciously burn, or set on fire any dwelling house of another, or any store, or other building, adjoining to, or parcel of a dwelling-house of another, such person shall be deemed guilty of arson and felony, and shall suffer death."). In 1893, the legislature revised the crime of arson and added a crime of arson in the second degree. 19 *Del. Laws*, c. 781, § 1 (1893). Since then, the legislature has accepted a complete revision of the criminal code, along with the crime of arson, at least once, in 1972. 58 *Del. Laws*, c. 497, § 1 (1972). A commission to revise the Delaware Criminal Code (the Governor's Committee for Revision of the Criminal Law) published a proposed code with commentary in 1967.

Governor's Committee for Revision of the Criminal Law, Proposed Delaware Criminal Code iii-v (1967) [hereinafter Proposed Code]. Upon further revisions, a second proposed code with commentary was published in 1973, Governor's Committee for Revision of the Criminal Law, Delaware Criminal Code with Commentary iii-v (1973) [hereinafter Code with Commentary], and its proposals made into law in 1972. 58 *Del. Laws*, c. 497, § 1 (1972). Pre–1972 law on arson in general constituted "an inconsistent hodgepodge of provisions, perhaps resulting from piecemeal enactment." Code with Commentary, *supra*, at 234. The Committee's changes essentially set the crime of first degree arson into its current form, punishing intentional burning when the arsonist knows or reasonably should know of the presence of another. *Id.* at 238–39. In 1989, the legislature revised the arson statutes relative to their classification as felonies or misdemeanors. 67 *Del. Laws*, c. 130, § 8 (1989). In 1995, the legislature revised the statute to make it gender neutral. 70 *Del. Laws*, c. 186, § 1 (1995).

**14.** 1829 *Del. Laws* c. 5, § 1, at 130 (1829).

**15.** 58 *Del. Laws*, c. 497, § 1 (1972).

**16.** Code with Commentary, *supra* note 13, at 239.

**17.** *Id.* (italics added).

danger to "human life" in general, not one particular human life. Moreover, their example contemplates one charge of first degree arson based on "at least some" potential victims, not only one potential victim.

As far back as 1874, the General Assembly classified arson as one of the "offences against private property."[18] The 1972 revision changed the statute essentially to its current form, but did not change the classification of arson as a property-based crime.[19] In determining whether a legislature contemplated the charging of multiple offenses based on multiple victims, Delaware courts have considered whether the offense is one against people or against property.[20] The legislature has consistently classified arson as the latter. The State responds that first degree arson, with its special focus on the probability of harm to people, constitutes a hybrid provision that is not subject to this general rule. The wording of even that provision, however, seems to focus not on the danger to one human life in particular, but to human life *in general.*

An analysis of the common law roots of Delaware's arson statute does not support the State's argument. Rather, it supports the argument that arson is a single crime regardless of how many human victims it threatens or claims. Arson at common law was "the malicious burning of the dwelling house of another."[21] William Blackstone explained that arson itself was "an offense of very great malignity, and much more pernicious to the public than simple theft: because, first, it is an offense against that right, of habitation, which is acquired by the law of nature as well as by the laws of society: next, because of the terror and confusion that necessarily attends it. . . ."[22]

Blackstone went on to explain that arson "is also frequently more destructive than murder itself, of which too often the cause: Since murder, atrocious as it is, seldom extends beyond the felonious act designed; whereas fire too frequently involves in the common calamity persons unknown to the incendiary, and not intended to be hurt by him, and friends as well as enemies."[23] This explanation does not contemplate multiple charges of arson depending on how many victims are intended harm but, rather, one single, serious[24] charge based the fact that fire is inherently, and unpredictably, destructive.

This Court's research has uncovered no cases that are directly on point. There are, however, three cases concerning arson multiplicity regarding statutes that elevate the degree of arson involved based on *actual* injury to a victim. Delaware's statute, by contrast, only looks to potential injury. In two of these three cases, courts ruled that charging multiple counts of arson for multiple victims was indeed a violation of the constitutional protection against double jeopardy.[25]

18. 20 *Del. C.* § 128 (1874).

19. 58 *Del. Laws,* c. 497, § 1 (1972).

20. *Passerin v. State,* 419 A.2d 916, 924 (Del. 1980).

21. John Poulos, *The Metamorphosis of the Law of Arson,* 51 Mo. L.Rev. 295, 299 (1986).

22. 4 W. Blackstone, Commentaries on the Law of England 220 (1st Am. Ed. 1772).

23. *Id.*

24. Arson at common law was a capital crime. *See* Poulos, *supra* note 21, at 299 ("Like most of the other common law felonies, [arson] was punishable by death.").

25. *See State v. Payne,* 134 Idaho 423, 3 P.3d 1251, 1254 (Id.2000) ("Although Payne's act of arson was enhanced to aggravated arson by virtue of the deaths of two persons, it does not follow that Payne may be convicted for two

*Lozano v. State* is instructive. In that case, a defendant started a fire that killed four people and injured five.[26] He was found guilty of five counts of arson.[27] The relevant statute provided for elevation of arson to first degree if "bodily injury or death is suffered by any person by reason of the commission of the offense...."[28] The Texas Third Court of Appeals held, "When bodily injury or death occurs as a result of· arson, the statutory offense against property remains unaffected, although the degree of the chargeable felony increases."[29]

In one case, by contrast, the court found no violation of the multiplicity doctrine.[30] That case, however, was sparsely reasoned[31] and was accompanied by a vigorous and lengthy dissent.[32] We conclude that the weight of the reasoning in the case law is against charging multiple counts of arson based upon multiple victims.[33]

The State's past charging practice for arson cases differs from its charging decision in this case. In an order asking for supplemental memoranda from the parties, this Court raised the issue of two cases in which there had been several victims but only one arson charge.[34] In one, *Chao v. State*, this Court referred to an incident as "the arson" notwithstanding the existence of several victims.[35] The State has made a similar charging decision in other cases.[36] The State has failed to cite any contrary cases. The State argues that its prosecutorial discretion in "select past cases" is beside the point. We believe, however, that charging history is relevant, but not dispositive.

acts of arson when there was only one fire."); *Lozano v. State,* 860 S.W.2d 152, 155–56 (Tex. Ct.App.1993) (holding that a defendant who had started a single fire causing the death or injury of five people "committed a single offense, allowing a single unit of prosecution").

**26.** *Lozano,* 860 S.W.2d at 153.

**27.** *Id.*

**28.** *Id.* at 154.

**29.** *Id.* at 155.

**30.** *See People v. Hanks,* 174 Ill.App.3d 555, 124 Ill.Dec. 153, 528 N.E.2d 1044, 1047–48 (1988) ("We conclude defendant was properly convicted of two offenses of aggravated arson against two victims resulting from defendant's single act of arson.").

**31.** The discussion of the issue consisted of a single paragraph of reasoning. *Id.*

**32.** *See id.* at 1049 (Lund, J., dissenting) ("[T]his legislation should be construed to provide for only one conviction of aggravated arson regardless of the number of firemen injured or the number of people present in the building ignited."). Justice Lund devoted his entire dissent, eight paragraphs long, to this contention. *Id.*

**33.** *See State v. Payne,* 134 Idaho 423, 3 P.3d 1251, 1254 (Id.2000) ("Although Payne's act of arson was enhanced to aggravated arson by virtue of the deaths of two persons, it does not follow that Payne may be convicted for two acts of arson when there was only one fire."); *Lozano,* 860 S.W.2d at 155–56 (holding that a defendant who had started a single fire causing the death or injury of five people "committed a single offense, allowing a single unit of prosecution"). *But see Hanks,* 124 Ill.Dec. 153, 528 N.E.2d at 1047–48 ("We conclude defendant was properly convicted of two offenses of aggravated arson against two victims resulting from defendant's single act of arson.").

**34.** *See Chao v. State,* 780 A.2d 1060, 1063 (Del.2001) (involving several deaths but only one count of arson); *Lawrie v. State,* 643 A.2d 1336, 1338 (Del.1994) (same).

**35.** 780 A.2d at 1063.

**36.** *Kirk v. State,* Del.Supr., No. 271, 2000, 2000 WL 1637418 (Oct. 16, 2000); *Hall v. State,* Del.Supr., No. 526, 1996, 1997 WL 597123 (Sept. 23, 1997); *Zimmerman v. State,* 565 A.2d 887, 889 (Del.1989); *Miller v. State,* 426 A.2d 842, 843 (Del.1981).

The logical extension of the State's argument is that, in allowing multiple counts of arson for multiple intended victims, there could be some absurd outcomes. Courts should avoid interpretations that "yield mischievous or absurd results."[37] Suppose, for example, that a defendant sets a fire in a closet next to a crowded banquet hall with 500 patrons, a fire alarm sounds, all file out quietly and uneventfully, and the defendant is captured and charged. May the State charge the defendant with 500 counts of arson? At oral argument, the State admitted that its theory would at least permit such a charging decision. There is nothing in the Delaware Code to indicate that the General Assembly intended 500 charges of arson in that situation, rather than one count to reflect the inherently dangerous nature of the offense of arson.

Moreover, Section 803(2) alternatively prohibits arson when a defendant "knows of circumstances which render the presence of another person . . . therein a reasonable possibility." The legislature cannot have intended that the State could charge an arson count based on each person whose presence at the location of the arson is a "reasonable possibility."[38]

The fact that the Delaware first degree arson provision focuses on the *intended* harm to third parties, not the *actual* harm, demonstrates the vulnerability of the State's argument. In *Lozano,* the applicable statute elevated arson to first degree if "bodily injury or death is suffered by any person by reason of the commission of the offense. . . ."[39] The Delaware statute, by contrast, requires only that the defendant either intend harm to another or know of circumstances that make another's presence a reasonable possibility. The former statute provides a limiting principle for multiple arson counts because it is easier to identify all those who suffer actual physical injury because of the fire. It may not be so easy to identify all those to whom a defendant intended harm, or those whose presence is a reasonable possibility.

The State does not lack for ways to seek additional punishment for those who start fires with the intent of harming multiple victims. In this case, it charged and convicted Handy of two counts of attempted murder in the first degree, one for Goslee and one for Houston.[40] This practice in arson cases involving intended victims may be appropriate, provided the elements of all the crimes charged can be proven.[41] Furthermore, should an arsonist cause actual harm or death, substantive charges based on that harm are available.[42]

---

37. *Spielberg v. State,* 558 A.2d 291, 293 (Del. 1989).

38. Suppose that a defendant sets a fire, quickly extinguished, in a corner of a store at a shopping mall. How many people are there for whom "presence" is a "reasonable possibility?" All the people at the store? All the people in the shopping mall? All the people who were going to enter the mall but could not because of the fire alarm?

39. 860 S.W.2d 152, 155 (Tex.Ct.App.1993).

40. *See* 11 *Del. C.* § 531 ("A person is guilty of an attempt to commit a crime if the person: . . . (2) Intentionally does or omits to do anything which, under the circumstances as the

person believes them to be, is a substantial step in a course of conduct planned to culminate in the commission of the crime by the person."); 11 *Del. C.* § 636(a)(1) ("A person is guilty of murder in the first degree when: (1) The person intentionally causes the death of another person. . . .").

41. *See State v. Liu,* 1995 WL 413449, *15 & n. 1, 1995 Del.Super. LEXIS 312, at *1 & n. 1 (Del.Super.) (recording a charge of one count of arson and one count of attempted first degree murder for a fire that killed three persons and threatened the life of another).

42. *See, e.g., id.* (recording a charge of three counts of first degree murder for an arson that claimed the lives of three victims).

Finally, the result we reach is consonant with the result in other Delaware cases on multiplicity. In *Passerin v. State*,[43] the defendant started a fire in a large building housing his business as well as five other businesses, each in separate units of the building.[44] Each of the units suffered extensive damage.[45] The State charged and convicted the defendant of five counts of arson.[46] The Court rejected the defendant's argument of "one match, one arson," holding that the General Assembly had indeed intended to provide for multiple counts of arson under the circumstances.[47] In that case, however, the General Assembly had specifically provided that "where a building consists of 2 or more units separately secured and occupied, each unit shall be deemed a separate building."[48]

Thus, in *Passerin* the General Assembly had made its intent known to allow multiple counts of arson for multiple destroyed units of a building. The commentary to a 1967 proposed revision, one which the 1972 revision implemented,[49] states, "It would appear desirable to penalize an apartment dweller who intentionally starts a fire and thereby recklessly burns down the apartment house, endangering and inconveniencing his fellow tenants."[50] Here, however, the probable legislative intent points in the opposite direction.

In certain respects, this case is similar to our recent case of *Williams v. State*.[51] In that case, we confronted the question of when the State could charge multiple counts of possession with intent to deliver a controlled substance.[52] We adopted the test set forth in *Rashad v. Burt*[53] asking whether the possessions were "sufficiently differentiated by time, location, or intended purpose...."[54] The same risk of unbounded prosecutorial discretion attends the ability to subdivide a stash of cocaine in whatever manner one sees fit as it does allowing a count of arson for every potential or intended victim.

### Prejudice and a Courtroom Disturbance

■ Handy's second argument is that the courtroom incident involving his former teacher who was dismissed as a juror and attempted to shake Handy's hand was so prejudicial that the Superior Court abused its discretion in failing to grant him a mistrial. The State responds that the event was not significantly prejudicial to Handy and could well have affected him favorably. We conclude that there was no basis for a mistrial in this case.

■ This Court reviews for abuse of discretion the decision of the Superior Court to deny a mistrial after a courtroom disturbance.[55] In *Taylor v. State*, we ruled

---

43. 419 A.2d 916 (Del.1980).

44. *Id.* at 918.

45. *Id.*

46. *Id.*

47. *Id.* at 924.

48. *Id.* (quoting 11 *Del. C.* § 222(1)).

49. Code with Commentary, *supra* note 13, at 24.

50. Proposed Code, *supra* note 13, at 271.

51. 796 A.2d 1281 (Del.2002).

52. *Id.* at 1283–84.

53. 108 F.3d 677 (6th Cir.1997).

54. *Id.* at 681.

55. *See Taylor v. State*, 690 A.2d 933, 935 (Del. 1997) ("A trial judge is in the best position to evaluate the prejudicial effect of an outburst by a witness upon the jury. Therefore, the decision on whether to grant a mistrial after an outburst by a witness rests within the trial judge's sound discretion.").

that the Superior Court had not abused its discretion in denying a motion for a mistrial.[56] In that case the State had charged the defendant with sexually molesting the children and grandchildren of one of the witnesses.[57] During her testimony, that witness broke down crying.[58] After stepping down, she passed the defense table, continued weeping, and shouted emotionally to Taylor, "You, you!"[59] This Court set forth four factors to consider in a courtroom disturbance case: (i) the nature of the disturbance; (ii) the likelihood of the jury being misled or prejudiced; (iii) the closeness of the case; and (iv) any curative action taken by the Superior Court.[60]

Here, the nature of the incident was minor. It certainly is less dramatic, and less directly relevant to the case, than the outburst in *Taylor*. The Superior Court here observed that the incident "just did not strike me as being all that important, frankly," and nothing in the record suggests otherwise.

Second, the likelihood of the jury being prejudiced against Handy was minimal. This is not a case like *Ashley v. State*.[61] In that case, a defendant was facing the death penalty for a prison stabbing; a courtroom spectator yelled out after closing arguments, "Don't think he's not guilty, he stabbed me in the back 14 times."[62] In that case, the courtroom disturbance alerted the jury to a highly prejudicial prior bad act of the defendant and the emotional nature of the disturbance most likely made it impossible for them to ignore it. There is no concern about prior bad acts here. Moreover, the State rightly suggests that the jury may actually have

been moved in Handy's favor by this occurrence. A former teacher of Handy's apparently thought so much of him that he was willing to offer to shake Handy's hand at a time when Handy was under scrutiny for some rather serious crimes. This may be seen by a rational juror to reflect favorably on Handy's character, not negatively.

Third, this case was not close. Both victims testified, and their testimony (as well as that of the responding authorities) was consistent. Furthermore, even on a cold record Handy's testimony is incredible. It is hard to believe that, had this incident not happened, any reasonable juror would have deemed Handy's testimony credible.

Finally, the trial judge did indeed give the jury a curative instruction. He instructed the jury that the incident had happened "because it is the Court's policy that no one approaches the defendant during the proceedings." The court further instructed the jury that "you [are] not to draw any conclusions from that particular incident one way or the other." This informed the jury of an explanation for the incident that did not reflect negatively on the defendant personally, as distinct from his status as a defendant. Thus, this instruction substantially mitigated any lingering uncertainty any rational juror may have had about the incident.

### Conclusion

We conclude that the Superior Court did not abuse its discretion in refusing to grant a mistrial for the courtroom incident involving Handy's former teacher. We

56. *Id.* at 936.

57. *Id.* at 934.

58. *Id.*

59. *Id.*

60. *Id.* at 935.

61. 798 A.2d 1019 (Del.2002).

62. *Id.* at 1021.

hold, however, that Handy's two convictions for first degree arson were multiplicitous. One sentence for first degree arson must be vacated and one sentence for first degree arson stands. Accordingly, we affirm in part, reverse in part, and remand to the Superior Court for sentencing consistent with this opinion.